Filed 7/17/26  In re I.S. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re I.S., a Person Coming Under the Juvenile Court Law. | B345672 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 23CCJP02080A) |
|     Plaintiff and Respondent, | |
|     v. | |
| S.S., | |
|     Defendant and Appellant, | |
| S.R., | |
|     Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant.

Katie Curtis, under appointment by the Court of Appeal, for Respondent S.R.

No appearance for Plaintiff and Respondent.

For the first time on appeal Mother S.S. challenges the visitation order issued by the juvenile court upon termination of the dependency case involving her child I.S. Mother contends the visitation order must be reversed because it fails to specify visit duration and frequency. We affirm.

## BACKGROUND

On June 20, 2023, the juvenile court authorized the emergency removal and detention of 12-year-old I.S. and his five younger half-siblings from Mother. On June 22, 2023, the Los Angeles County Department of Children and Family Services (Department) then filed a petition alleging Mother's substance abuse and the domestic violence between her and the father of the half-siblings posed a substantial risk of physical harm to the children. I.S.'s father S.R. (Father) was not named in the petition as he had not been located by the Department. In August 2023, the juvenile court sustained the interlineated petition.

On February 13, 2024, Father called the social worker and said he had received a letter from the Department. He asked, "Is my son okay? Did anything happen to my son?" The social worker told Father about the case, and Father said, "I want my son" and "Tell my son I'm coming." Father said that the last time he spoke with Mother was early 2021, when he asked Mother to let I.S. come live with him, but Mother stopped communicating with him after he sent money to her. Father said he tried to find his son and Mother had kept him away. She would send him Facebook messages and Father would send her money.

Father was retired from the military and lived in Georgia with his wife and five of his seven children. He worked as a football coach to local youth. Father reported that he and Mother met in the military and lost contact when Mother was discharged

2

due to her pregnancy; in 2011, Father completed a paternity test and learned he was I.S.'s father.  Father said he used to talk to I.S. on FaceTime, but mother stopped answering his calls.  The social worker then spoke to I.S. who confirmed that he used to talk to Father and FaceTime with him.  I.S. and Father then spoke with each other; Father said he wanted I.S. to come live with him and I.S. had an excited and positive reaction.

On February 14, 2024, the matter came on for a six-month review hearing.  Father appeared in court for the first time and the court was informed that Father was seeking release of the minor to his care.  The Department started a background check of Father and confirmed that he and his wife had no history of child abuse, neglect, or criminal convictions.  On March 7, 2024, Father attended a Child and Family Team meeting and said his goal was to raise I.S. in his care to be "morally and spiritually sound."  The Department recommended that I.S. be released to Father and jurisdiction terminated with sole legal and physical custody to Father and monitored visits for Mother.

On April 3, 2024, the Department recommended that Father be offered services while it continued to assess the development of their father-son relationship and prepare a plan to transition I.S. to Father's care.  Father had a room for I.S. in his home, he was open to a home inspection and visits from I.S.; he understood I.S. had a bond with his half-siblings and would not prevent I.S. from calling them.

On June 11, 2024, the Department filed a report recommending that the court release I.S. to Father's care upon conclusion of the school year.  Father and I.S. were having FaceTime and phone calls several times a week and had established a trust and bond with each other.  Father's wife and

3

children in Georgia wanted I.S. to come live with them.  Father was consistent in the virtual visits and I.S. expressed happiness in getting to know Father; he supported the idea of living with Father.

Mother was having phone visits with I.S. and almost always cancelled or did not show up to in-person visits.  I.S. said he missed mother and wished they had more in-person visits.  I.S. said he was hurt by Mother's failure to visit him.  He said he would want to live together with Mother and his siblings.  I.S. also said he was satisfied to keep in contact with Mother and his half-siblings over video and phone calls.

On July 26, 2024, the juvenile court found Father was I.S.'s biological father based on genetic testing.  On August 9 and 30, 2024, the social worker accompanied I.S. to Georgia for visits with Father.  I.S. was positive about the visits and said he wanted to live with Father.  Father planned to enroll the minor in the high school where his siblings were, enroll him in sports programs, and enroll him in mental health services if needed.

On September 19, 2024, the Department reported that mother had not enrolled in or completed any court-ordered services.  It assessed a high risk if the children were returned to her care and recommended that Mother's reunification services be terminated.  Father completed a parent education and family stabilization class.

On September 25, 2024, the juvenile court found Father was I.S.'s presumed father and released I.S. to Father's care.  On October 3, 2024, I.S. moved to Father's home in Georgia.  Father acknowledged Mother was upset about the move and said he would keep her updated on all matters pertaining to I.S.  I.S. said he was doing well and happy to be with Father.

On November 13, 2024, the Department reported that I.S. wanted to stay in Georgia. He said it felt "like peace" there. He said he talked to Mother and his brother and knew Father would arrange calls with his other siblings if he asked. Father advised Mother called almost daily to speak to I.S.

On March 26, 2025, minor's counsel advised the juvenile court that I.S. was "doing really well with the father. He's thriving." The Department reported that Father was "attentive to [I.S.'s] needs" and made the child available for phone calls with the Department, Mother and his younger siblings. Father assisted with monitoring visits by Mother and the siblings.

Mother complained that Father had filled out paperwork to change I.S.'s last name without her consent. The Department reported that phone calls for Mother were scheduled regularly. I.S. was unsure if he wanted to see Mother in person and liked phone calls when Mother did call him.

On March 26, 2025, the juvenile court found that the conditions which justified the initial assumption of jurisdiction no longer existed as to I.S. and were not likely to exist if supervision were withdrawn. Mother did not appear at the hearing. The court indicated its intention to terminate jurisdiction. Mother's counsel asked the court to order joint legal custody with father holding tiebreaking authority. The juvenile court denied counsel's request; it granted Father sole legal and physical custody of I.S. and terminated jurisdiction.

With respect to visitation, the court ordered "monitored visits for mother. Mother and father to agree upon the monitor. If they cannot agree, mother to pay for the monitor. That's for in-person, as well as virtual visits." The court also ruled that "Mother can seek a modification after completing her case plan in

the appropriate family law court." The court gave Mother's counsel further opportunity to comment; he did not. The signed juvenile custody exit order permits Father to serve as monitor. Mother timely appealed.

## DISCUSSION

By failing to object to the juvenile court's visitation order, Mother has forfeited her challenge on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962; *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 686.) We acknowledge we have discretion to consider forfeited issues. That discretion "should be exercised rarely and only in cases presenting an important legal issue." (*In re S.B.,* at p. 1293.) Mother has not persuaded us this is such a case.

In any event, a juvenile court's decision to terminate dependency and to issue exit orders is reviewed for abuse of discretion and may not be disturbed unless the court's determination was arbitrary, capricious, or patently absurd. (*In re M.R.* (2017) 7 Cal.App.5th 886, 902.) Exit orders are guided by the child's best interests and the totality of the circumstances. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201; *In re John W.* (1996) 41 Cal.App.4th 961, 973, superseded on other grounds as stated in *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 102–103.)

We find no abuse of discretion here. The parents were cooperating in arranging video and telephone calls between Mother and I.S.; I.S. was happily living with Father in Georgia and was satisfied with the video and telephone contact he was having with his half siblings and Mother (although he wished Mother made herself more available to him for contact); and

6

Father was committed to ensuring that I.S. had the visitation he wanted with his half siblings and Mother.

Mother argues that leaving the frequency and duration of visits unspecified was an impermissible delegation of judicial authority under *In re T.H.* (2010) 190 Cal.App.4th 1119. We disagree. *T.H.* involved a custody order that delegated absolute discretion over visitation to the mother who had sole physical and joint legal custody with the father. It conditioned the father's right to visit the child on the agreement of the mother. (*Id.* at p. 1123.) Supervised visitation could occur only upon the "agreement of the parents." (*Ibid*). Because the parents in *In re T.H.* were at odds over decision making, the court of appeal held that father's right to visitation was "illusory when left solely to the 'agreement' of a parent who was unlikely to agree." (*Id.* at p. 1124.)

Such was not the case here. The visitation order itself did not give one parent control over the other. Under these circumstances, leaving the timing and duration of visitation to be arranged between the parents was not an abuse of discretion. It was a flexible response to Mother's still changing personal circumstances and the geographic distance between Mother and I.S.

## DISPOSITION

The order of the juvenile court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                        STRATTON, P. J.

We concur:



WILEY, J.



SCHERB, J.

8